# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **PATRICK OLIVER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | Civil Action Number |
| | ) | **2:15-cv-00905-AKK** |
| **MONY LIFE INSURANCE** | ) | |
| **COMPANY and DISABILITY** | ) | |
| **MANAGEMENT SERVICES, INC.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION

Patrick Oliver filed this action against MONY Life Insurance Company ("MONY") and Disability Management Services, Inc. ("DMS"), alleging claims of fraud (Count I), suppression of material facts (Count II), breach of contract (Count III), bad faith failure to pay insurance (Count IV), negligence and wantonness (Count V), and trespass to property (Count VI). Doc. 1-1. Defendants timely removed the action to this court on the basis of diversity jurisdiction. *See* doc. 1. The court has for consideration Oliver's motion for summary judgment as to Counts III and IV, doc. 27, MONY's motion for summary judgment as to all counts, doc. 30, and DMS's motion for summary judgment as to all counts, doc. 32. The motions are fully briefed, docs. 28; 31; 33; 38; 39; 42; 43; 44, and ripe for

review.  For the reasons stated below, Oliver's motion is due to be denied, and MONY's and DMS's motions granted.

## I.      STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(a), summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (alteration in original).  The moving party bears the initial burden of proving the absence of a genuine dispute of material fact.  *Id.* at 323.  The burden then shifts to the non-moving party, who is required to go "beyond the pleadings" to establish that there is a "genuine issue for trial."  *Id.* at 324 (internal citations and quotation marks omitted).  A dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The court must construe the evidence and all reasonable inferences arising from it in the light most favorable to the non-moving party.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *see also Anderson*, 477 U.S. at 244 (all

justifiable inferences must be drawn in the non-moving party's favor).  Any factual dispute will be resolved in the non-moving party's favor when sufficient competent evidence supports that party's version of the disputed facts.  *But see Pace v. Capobianco*, 238 F.3d 1275, 1276–78 (11th Cir. 2002) (a court is not required to resolve disputes in the non-moving party's favor when that party's version of events is supported by insufficient evidence).  However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (citing *Bald Mountain Park, Ltd. v. Oliver*, 863 F.2d 1560, 1563 (11th Cir. 1989)).  Moreover, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that a jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 252).

## II.  FACTUAL BACKGROUND

Oliver purchased a disability income policy from MONY in 1987.  Doc. 29-1 at 27.  The policy defines "incapacity," in relevant part, as follows:  "due to the Injury or Sickness, you are not able to perform the substantial and material duties of your Regular Occupation, you are not gainfully employed in another occupation, and you are under the Regular Care of a Physician because of that Injury or Sickness. . . . ."  Doc. 34-4 at 7.  "Regular Occupation" means the "occupation in

which you were most recently engaged at the start of your Incapacity." *Id.* Oliver last worked in 2006 as a home inspector. Docs. 34-4 at 7; 34-1 at 503–05. Seven years after abandoning his profession, Oliver sustained a back injury while "hooking up a dryer." Doc. 34-3 at 16. After receiving treatment from Dr. Lloyd Johnson, a board-certified orthopedic specialist, Oliver submitted a claim to MONY, along with an "attending physician's initial disability statement form," *see id.* at 23, in which Dr. Johnson "certified [Oliver as having] Total Disability/Incapacity due to lumbar degenerative disc disease, radiculitis and spondylolisthesis." Docs. 29-2 at 3; 34-1 at 797.

DMS, a "third-party administrator for disability plans," is the entity with authority to approve or deny claims submitted to MONY. *See* docs. 1-4 at 2; 29-3 at 9; 29-5 at 10. In early 2014, DMS presented Oliver's claim file to its Medical Consultant, Michelle Licciardello. Doc. 29-5 at 9. Licciardello, a licensed physical therapist, found Oliver's medical records inconclusive as to "functional restrictions" or "tolerances for activities." *See id.* at 12; doc. 34-1 at 529–31, 618, 620. Licciardello noted that Oliver did not "seek regular and appropriate care . . . as one would expect if his complaints were as high and as significant as reported."[1] Doc. 29-5 at 18.

---

[1] Although the medical records indicated Oliver did not seek care because of personal obligations related to his wife's cancer treatment, Licciardello did not include this information in

Sometime after Licciardello's review, Brian Hayes, the claims adjuster assigned to Oliver's file, contacted Oliver in April 2014.  Hayes informed Oliver that:

> [U]nder the terms of your policy, we are unable to determine if you have an Incapacity . . . that prevents you from performing the substantial and material duties of your Regular Occupation . . . *because you were not engaged in a Regular Occupation against which an alleged Incapacity from performing that occupation may be evaluated*.  In such a circumstance it would therefore be reasonable to determine if you have an Incapacity from engaging in the *daily activities that were substantial and material to you prior to the Onset Date of disability*.

Doc. 29-2 at 3 (emphasis added).  In other words, although Oliver's policy only references a "regular occupation," MONY and DMS nonetheless decided to examine Oliver's general functionality, or ability to perform his daily activities, due to Oliver's lack of an occupation as of or immediately prior to the onset date. *See id.*

Shortly after Hayes's letter, DMS and MONY issued Oliver a "good will" payment of $4,946.67 covering September, October, and November 2013.  DMS authorized the partial payment because the medical records reflected a period of time where Oliver "may have had problems performing" his "activities of daily living [ADLs]."  *See* doc. 29-4 at 11.  However, according to Licciardello, defendants made no payments after November 2013 because "Dr. Johnson's

---

her report because she "cannot comment on an insured's . . . outside home life or complications or life events."  Doc. 29-5 at 14, 18.

records from November 21st, 2013 and December 19th, 2013 . . . indicate[d] improvement." Docs. 29-5 at 11; 34-18 at 11; 34-1 at 503–05. The finding of an improvement was based on Oliver's report that his pain rated at a 3 or 4 out of 10 during his November and December medical appointments, down from an "8 out of 10" in September of 2013. Doc. 29-5 at 11. Licciardello also emphasized that Dr. Johnson had noted "no instability"[2] on Oliver's MRI report, *id.* at 31; doc. 34-1 at 531, 619, 622–23, and that Oliver's radiologist did not identify some of the "disk protrustion[s]" noted by Dr. Johnson, doc. 29-5 at 35. Although DMS scheduled a call with Dr. Johnson in May 2014 to clarify his report, "when Licciardello attempted the call . . ., Dr. Johnson's staff informed her that Dr. Johnson would not speak with her." Doc. 31 at 8 (citing doc. 34-1 at 464).

In July 2014, DMS and MONY offered Oliver $33,600[3] to "buy back" the policy. *See* doc. 34-3 at 93. Oliver rejected the offer, and defendants continued to process Oliver's claim. *See* docs. 34-1 at 413; 34-3 at 93. Around this time, MONY received additional records from Oliver's new pain management specialist

---

[2] Licciardello testified that "[t]he instability at L4-5 would provide a greater correlation between his findings and the complaints reported; that instability would be expected to contribute to symptoms with flexion, with extension, with sitting — he would have symptoms more with global activities versus the degenerative changes and the degenerative disk disease, which is identified, which you would expect to cause an increase in symptoms, most significantly with standing, walking and extension activities." Doc. 29-5 at 31.

[3] This sum was the equivalent of twelve months of Oliver's benefits, doc. 29-3 at 15, but "the $33,600 lump sum ha[d] no relationship to any of the present value calculation for Mr. Oliver's policy," *id.* at 14.

and Dr. Johnson.  *See* doc. 34-1 at 419, 421–36.  After reviewing the new records, Licciardello noted on September 10, 2014 that the MRI did not corroborate the degree of complaints and severity of Oliver's reported limitations, and that Oliver could still perform certain ADLs, including self-care activities, household tasks, and caring for his wife.  *See id.* at 405–06, 426–30; doc. 34-5 at 34.  Because Dr. Johnson "continued to certify disability" for Oliver as of October 2014, Licciardello recommended an independent medical examination ("IME").  Docs. 29-5 at 18; 34-1 at 362–63.

DMS's IME coordinator attempted to contact "over 50 physicians" to perform the IME, but none of these physicians were "willing to perform the examination."  Doc. 34-7 at 3.  After DMS finally succeeded in scheduling an IME in Birmingham, Alabama with Dr. Spain Hodges, Dr. Hodges subsequently cancelled the appointment.  Docs. 29-5 at 28; 29-1 at 49; 34-7 at 4.  The cancellation prompted Brian Hayes to send Licciardello resumes for Dr. Geoffrey Connor in Homewood, Alabama, and Dr. Curt Freudenburger in Huntsville, Alabama.  *See* doc. 34-7 at 4.  Although it would require Oliver to travel, Licciardello selected Dr. Freudenbuger, because unlike Dr. Connor, a "general orthopedist . . . [whose] CV didn't indicate extensive spine work, . . . Dr. Freudenburger [was] a spine specialist."  Doc. 29-5 at 29.  *See* doc. 34-7 at 4–5.  Oliver, who lives in the greater Birmingham area, refused to travel to Huntsville

despite defendants' offer to pay for his travel and defendants' right under the policy to request an IME.  *See* docs. 34-7 at 4–5; 34-3 at 45; 34-4 at 11.  Oliver filed this lawsuit instead.

After filing his lawsuit, at defendants' request, Oliver underwent a physical examination by Dr. Stephen Nichols pursuant to Federal Rule of Civil Procedure 35.  According to Licciardello, Dr. Nichols "identified an instability which Dr. Johnson had failed to identify."  Doc. 29-5 at 37.  Dr. Nichols reported, among other things, that Oliver's "complaints correlate[d] with [the] objective findings."  Doc. 34-15 at 29.  Based on Dr. Nichols's report, *see id.* at 28–30, DMS finally approved Oliver's claim on July 12, 2016.  *See* doc. 29-4 at 12.

## III. ANALYSIS

At issue in this lawsuit is Oliver's contention that defendants wrongfully delayed payment of his claim despite Dr. Johnson's certification of Oliver as totally "incapacit[ated]" or "disab[led]."  *See* doc. 28 at 24.  Defendants counter that they had arguable reasons to continue investigating the claim, that Oliver failed to submit to an IME (and thus failed to perform under the contract), and that Oliver "premature[ly]" resorted to litigation before defendants had all the information necessary to resolve Oliver's claim.  *See* doc. 31 at 3.  The court addresses the parties' motions for summary judgment as to each claim below, in sequential order based on the complaint.

## A. Fraud (Count I)

In Count I, Oliver pleads that defendants committed fraud "by representing . . . that [Oliver] would receive disability insurance coverage as a result of [Oliver's] inability to work," that defendants "accepted [Oliver's] premium payments for said insurance coverage," but then "defendants denied coverage and refused to pay the claim."   Doc. 1-1 at 8.   To prove fraud, Oliver must show "(1) a false representation (2) of a material existing fact (3) reasonably relied upon by [Oliver] (4) who suffered damages as a proximate consequence of the misrepresentation." *Exxon Mobil Corp. v. Ala. Dep't of Conservation & Natural Res.*, 986 So. 2d 1093, 1114 (Ala. 2007) (citing, *e.g.*, *Saia Food Distribs. & Club, Inc. v. SecurityLink from Ameritech, Inc.*, 902 So. 2d 46, 57 (Ala. 2004)).   This claim fails, in part, because Oliver testified that MONY did not make any misrepresentations to him. *See* doc. 34-3 at 46 (Q: "Do you claim that anyone from [MONY] made any misrepresentations to you?"  . . . A:  "No.  I can't say – I can't say that they had anything to do with it.").   Moreover, as to DMS, Oliver failed to identify any specific misrepresentations DMS purportedly made.  *See id.*  Facts, rather than rank speculation, are necessary to defeat summary judgment.   *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005) (quoting *Hedberg v. Ind. Bell. Tel. Co.*, 47 F.3d 928, 931–32 (7th Cir. 1995)) ("'[U]nsupported speculation . . . does not meet a party's burden of producing some defense to a summary

judgment motion. Speculation does not create a *genuine* issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment.'") (emphasis in *Hedberg*). Oliver's failure to offer specifics to support his claim dooms this claim, and summary judgment is due on Count I for defendants.[4]

## B. Suppression of Material Facts (Count II)

In Count II, based on the April 2014 initial partial payment and the July 2014 lump sum settlement offer, Oliver contends that defendants "suppressed and/or concealed the facts that [Oliver's] disability claims would only be paid on a reduced value . . . ." Doc. 1-1 at 8–9. Oliver further alleges that "[o]n October 16, 2014, [DMS] and MONY represented to [Oliver] that [DMS] and MONY had not completed the evaluation of [Oliver's] claim," when they had "in fact previously approved [Oliver's] claim in April 2014 and July 2014." *Id.* These contentions fail to establish a suppression claim because there is no evidence that the partial payment or the settlement offer induced Oliver to act to his detriment. *See Foremost Ins. Co. v. Parham*, 693 So. 2d 409, 423 (Ala. 1997) (citing *Wilson v. Brown*, 496 So. 2d 756 (Ala. 1986)) (a suppression claim requires "1) a duty to

---

[4] To the extent Oliver's fraud claim is based on the alleged breach of the contract, such a claim is not recognized under Alabama law. *See, e.g.*, *Hanners v. Balfour Guthrie, Inc.*, 564 So. 2d 412, 414 (Ala. 1990) (stating that to prevail, the plaintiff needs "evidence . . . that, at the time . . . the promises of future action or abstention were made, the promisor had no intention of carrying out the promises," and that "[t]he failure to perform, alone, is not evidence of intent not to perform at the time the promise was made. If it were, a mere breach of contract would be tantamount to fraud.") (citations and quotation marks omitted).

disclose the facts, 2) concealment or nondisclosure of material facts by the defendant, 3) inducement of the plaintiff to act, and 4) action by the plaintiff to his injury"). Accordingly, defendants' motions as to Count II are due to be granted.

## C. Breach of Contract (Count III)

In Count III, Oliver contends that defendants breached the insurance contract by constructively denying his claim. *See* doc. 28 at 18. The claim against DMS fails, because, under Alabama law, a third party adjuster who is not a party to an insurance contract cannot breach that contract. *See Ligon Furniture Co. v. O.M. Hughes Ins., Inc.*, 551 So. 2d 283, 285 (Ala. 1989). Therefore, DMS's motion is due to be granted.

As to Oliver's contention that MONY breached the insurance contract, to prevail, Oliver must prove: (1) a valid contract; (2) Oliver's performance; (3) MONY's breach; and (4) damages. *See Armstrong Bus. Servs. v. AmSouth Bank*, 817 So. 2d 665, 673 (Ala. 2001); *Employees' Benefit Ass'n v. Grissett*, 732 So. 2d 968, 975 (Ala. 1998). Where, as here, Oliver is proceeding on a constructive denial theory, he "can establish a constructive denial [claim] in two ways: (1) by showing that the passage of time is so great that the delay alone creates a denial; or (2) by showing sufficient delay in payment coupled with some wrongful intent by the insurance company." *Cong. Life Ins. Co. v. Barstow*, 799 So. 2d 931, 938 (Ala. 2001) (quoting *State Farm Fire & Cas. Co. v. Slade*, 747 So. 2d 293, 317 n.6 (Ala.

1999)).  For the reasons stated below, the court finds that Oliver has failed to prove his claim.

Although Oliver is pursuing both theories of constructive denial,[5] the court will analyze his claims jointly since they rely on the same basic contention, *i.e.*, that defendants unreasonably delayed approving his claim even though the medical evidence supported his contention of incapacity.  For its part, MONY counters that it never denied or ceased processing Oliver's claim, that Oliver has suffered no damages, and that Oliver's refusal to travel to Huntsville for an IME in May 2015 contributed to the delay.  Doc. 39 at 11–12.  Indeed, MONY is correct that the policy entitles it to request an IME, *see* doc. 34-4 at 11, and in fact Oliver does not challenge the requirement for an IME.  Oliver states instead that MONY acted unreasonably in requiring that he travel to Huntsville.  While MONY is correct that Oliver "regularly traveled 60 miles from his home to his lake house and acknowledged that he had taken three trips to Orange Beach, Alabama, since the

---

[5] Oliver states that the passage of "more than thirty-one (31) months from November 2013 through July 2016 supports a finding of constructive denial."  Doc. 28 at 18 (footnote added).  Also, Oliver says that the following undisputed facts support a finding of "wrongful intent":   (1) no licensed medical doctor ever disputed Dr. Johnson's certification of incapacity/disability; (2) defendants failed to conduct any occupational or vocational analysis or a functional capacity exam; (3) in March 2014, DMS offered Oliver a $33,600 "extra-contractual" buy back of Oliver's policy if Oliver would sign a release of all claims; (4) Licciardello's May 1, 2014 medical report faulted Oliver for not seeking treatment for his pain during the period when Oliver provided care for his wife who was undergoing chemotherapy; (5) Licciardello did not include Dr. Johnson's disability certification and attending physician statements in her reports to DMS; and (6) after Oliver refused to travel to Huntsville for the IME, DMS rejected Dr. Freudenberger's offer to conduct a "peer review" of Dr. Johnson's findings.  Doc. 28 at 20–21.

start of his alleged incapacity," doc. 39 at 13 (citing doc. 34-3 at 43), and that some courts have found that requiring a plaintiff to travel 100 miles is not unreasonable, *see Woodard v. Walmart Stores East, LP*, No. 5:09-cv-428(CAR), 2010 WL 3455342, at *3 (M.D. Ga. 2010) (holding that requiring the plaintiff to travel "100 miles" was not unreasonable in light of the plaintiff's travel habits during the relevant time period and the defendants' offer to cover any travel costs); *Driggers v. Vezer's Precision Indus. Constr. Int'l*, No. 1:05-cv-201-SPM/AK, 2007 WL 1655612 (N.D. Fla. 2007) (not unreasonable to require plaintiff to travel approximately 150 miles and outside of the federal district for Rule 35 medical examination), by focusing on the refusal to travel, MONY ignores that Oliver contends that MONY purportedly unreasonably delayed for approximately 18 months *before* arranging the IME in Huntsville.  Moreover, Oliver contends that this delay purportedly occurred despite Dr. Johnson's certification of total incapacity/disability and MONY's failure to conduct any vocational analysis pursuant to the plain language of the policy, *see* doc. 34-4 at 7.

Unfortunately for Oliver, a constructive denial theory does not eliminate the damages component of the elements of a breach of contract claim.  In that respect, even if a factual dispute exists with regard to the reasonableness of asking Oliver to travel or whether defendants unnecessarily delayed in processing the claim,

Oliver's only damages are mental anguish associated with the delay in approving

his claim.  Oliver described these damages as follows:

> I'm losing my house because of it.  I'm not able — I wasn't able to afford to take care of my wife who needed me more than any time in her life.  I couldn't afford a sitter.  She needed twenty-four hour care and had I received my benefits I could have gotten through this a whole lot better.  . . . .

> Q.     I want to know how it's affected you.  Anything else?

> A.     The anxiety and misery, I can't even calculate how you would put that on a man.

Doc. 34-3 at 46.  These "damages" may not be enough because the general rule is

that "the law in [Alabama] does not permit recovery for . . . mental anguish and

suffering in an action for breach of an insurance contract."  *Vincent v. Blue Cross-*

*Blue Shield, Inc.*, 373 So. 2d 1054, 1056 (Ala. 1979).

There is an exception to the general rule, however, "where the contractual

duty or obligation is so coupled with matters of mental concern or solicitude, or

with the feelings of the party to whom the duty is owed, that a breach of that duty

will necessarily or reasonably result in mental anguish or suffering."  *Liberty*

*Homes, Inc. v. Epperson*, 581 So. 2d 449, 454 (Ala. 1991) (quoting *F. Becker*

*Asphaltum Roofing Co. v. Murphy*, 141 So. 630, 631 (Ala. 1932)).  Oliver argues

that his circumstances fit within this exception, *see* doc. 42 at 7, and directs the

court to *Mechler v. John Hancock Life Ins. Co.*, No. 07-0724-CB-M, 2008 WL

4493230 (S.D. Ala. Sept. 30, 2008).  *Mechler* involved a breach of contract claim

for mental anguish due to an insurance company's failure to pay benefits to allow the plaintiff's mother to obtain home health care.  Due to the denial, while unattended at home, the plaintiff's mother fell and broke her hip.  *Id.* at **1, 4. Based on these facts, the *Mechler* court found that "[a] long-term care insurance policy providing for home healthcare benefits implicates sensitive subject matter — that is, a person's ability to live safely, independently, and with dignity in her own home," and that "[t]he ability to remain in one's home despite the infirmities that accompany old age is, in this Court's opinion, one of those matters of 'mental concern' or 'solicitude' for which the *Becker* court carved an exception."  *Id.* at *6.

Oliver's reliance on *Mechler* overlooks that Alabama courts have made it clear that the exception is a narrow one.  As the Eleventh Circuit put it:

> The majority of the cases in which a plaintiff has been allowed to recover damages for mental anguish involved actions on "contracts for the repair or construction of a house or dwelling or the delivery of utilities thereto, where the breach affected habitability."  *See, e.g.*, *Epperson*, 581 So. 2d at 454; *Orkin Exterminating Co. v. Donavan*, 519 So. 2d 1330 (Ala. 1988); *Lawler Mobile Homes, Inc. v. Tarver*, 492 So. 2d 297 (Ala. 1986); *Alabama Power Co. v. Harmon*, 483 So. 2d 386 (Ala. 1986).  Because a person's home is said to be his "castle" and the "largest single individual investment the average American family will make," these contracts are "so coupled with matters of mental concern or solicitude or with the feelings of the party to whom the duty is owed, that a breach of that duty will necessarily or reasonably result in mental anguish or suffering."  *B & M Homes, Inc. v. Hogan*, 376 So. 2d 667, 671–72 (Ala. 1979). . . . .
>
> A smaller number of cases has permitted such recovery in actions involving the burial of loved ones, suits based on a physician's promises to deliver a child, and claims based on the breach of a new

car warranty where the owner suffers significant fear, anxiety, and embarrassment.  *See Taylor v. Baptist Medical Center, Inc.*, 400 So. 2d 369 (Ala. 1981); *Volkswagen of America, Inc. v. Dillard*, 579 So. 2d 1301 (Ala. 1991).

> The Alabama Supreme Court has made very clear, however, that all these cases represent an exception to the general rule prohibiting mental anguish damages for breach of contract.  These cases deserve special treatment because it is highly foreseeable that egregious breaches of certain contracts — involving one's home or deceased love one, for example — will result in significant emotional distress.  *See Sexton v. St. Clair Federal Sav. Bank*, 653 So. 2d 959, 962 (Ala. 1995).

*Ruiz de Molina v. Merritt & Furman Ins. Agency, Inc.*, 207 F.3d 1351, 1359–60 (11th Cir. 2000).  Although Oliver claims he is losing his home and that the delay impacted his ability to provide the best care for his wife, Oliver last worked in 2006.  As such, at the time he applied in 2013 for benefits under the policy, the benefits were not the standard replacement of income benefits that would allow the court to find that defendants should have known that the delay in approval would impact Oliver's ability to stay in his home or provide care for his wife.  Based on the record before this court, the court cannot find that the damages Oliver identifies go to the heart of his disability policy, such that it was highly foreseeable that a breach of the insurance contract would result in these damages.

In light of Oliver's failure to satisfy the last element of his breach of contract claim, MONY's motion as to Count III is due to be granted, and Oliver's motion denied.

### D. Bad Faith Failure to Pay Insurance Claim (Count IV)

In Count IV, Oliver pleads that defendants committed bad faith because they "knew that the claim file contained medical information from qualified medical doctors confirming [his] disabling condition" and, therefore, "did not have a reasonable basis to deny the claim." Doc. 1-1 at 11. As an initial matter, because a bad faith claim requires a direct contractual relationship between the parties[6] and it is undisputed that no contractual relationship exists between Oliver and DMS, doc. 33 at 4, the claim against DMS fails. *See Williams v. State Farm Mut. Auto. Ins. Co.*, 886 So. 2d 72, 75–76 (Ala. 2003); *see also Metmor Financial, Inc. v. Commonwealth Land Title Ins. Co.*, 645 So. 2d 295, 297 (Ala. 1993) (for tort cause of action for bad faith to arise, "[a]n insurer-insured relationship must exist"); *Ligon Furniture Co.*, 551 So. 2d at 285 ("The tort of 'bad faith' is not a cognizable cause of action in Alabama, except in the context of a breach of an insurance

---

[6] Bad faith has four elements, plus a conditional fifth element:

(a) an insurance contract between the parties and a breach thereof by the defendant; (b) an intentional refusal to pay the insured's claim; (c) the absence of any reasonably legitimate or arguable reason for that refusal (the absence of a debatable reason); (d) the insurer's actual knowledge of the absence of any legitimate or arguable reason; (e) if the intentional failure to determine the existence of a lawful basis is relied upon, the plaintiff must prove the insurer's intentional failure to determine whether there is a legitimate or arguable reason to refuse to pay the claim.

*State Farm Fire & Cas. Co. v. Brechbill*, 144 So. 3d 248, 257 (Ala. 2013) (quoting *National Sec. Fire & Cas. Co. v. Bowen*, 417 So. 2d 179, 183 (Ala. 1982)).

contract, *by a party to that insurance contract*.") (citations omitted, emphasis added).

Based on Oliver's brief, it seems Oliver is pursuing an abnormal bad faith claim against MONY. *See* doc. 28 at 24, 26 (stating MONY "created its own debatable reason" to constructively deny his claim and/or "relied on an ambiguous portion of the policy," *i.e.*, the definition of "Regular Occupation," to do so). The complaint does not mention these allegations or this theory of bad faith, however, *see* doc. 1-1 at 10–12, and "[i]t is well-settled in this circuit that a plaintiff may not amend the complaint through argument at the summary judgment phase of proceedings." *GeorgiaCarry.org, Inc. v. Georgia*, 687 F.3d 1244, 1258 n.27 (11th Cir. 2012); *see also Gilmour v. Gates, McDonald and Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004). Nonetheless, to briefly address Oliver's abnormal bad faith theory, to the extent MONY processed the claim beyond Oliver's purported "regular occupation" as a home inspector, Oliver still must show that MONY lacked a legitimate or arguable reason to deny the claim. *Nat'l Ins. Ass'n v. Sockwell*, 829 So. 2d 111, 127 (Ala. 2002); *see also State Farm Fire & Cas Co. v. Brechbill*, 144 So. 3d 248, 258 (Ala. 2013) (citing *Gulf Atlantic Life Ins. Co. v. Barnes*, 405 So. 2d 916, 924 (Ala. 1981)) ("Regardless of whether the claim is [one for normal or abnormal bad faith], the tort . . . requires proof of [an] absence of legitimate reason for denial."); *Atl. Specialty Ins. Co. v. Mr. Charlie Adventures,*

*L.L.C.*, 644 F. App'x 922, 926 (11th Cir. 2016) (quoting *Nat'l Sec. Fire & Cas. Co.*

*v. Bowen*, 417 So. 2d 179, 183 (Ala. 1982)) ("Alabama courts have made clear

that, '[w]hen a claim is fairly debatable, the insurer is entitled to debate it, whether

the debate concerns a matter of fact or law.'") (some quotation marks omitted);

*Pyun v. Paul Revere Life Ins. Co.*, 768 F. Supp. 2d 1157, 1171–72 (N.D. Ala.

2011) (because the insurance company had a "reasonably debatable reason" for

denying the plaintiff's claim, the insurance company was due summary judgment

on the plaintiff's abnormal bad faith claim).

Unlike a traditional disability insurance claimant, Oliver had not held a

vocation for over six years at the start of his incapacity.  Consequently, "MONY

evaluated his claim based on his ability to perform the daily activities he was

actually engaged in at the time of his disability claim."  Doc. 31 at 22.  Oliver

claims that, in doing so, MONY "created its own debatable reason [for

constructively denying his claim] by going outside the policy language.'"  Doc. 28

at 26.  Oliver also (correctly) asserts that "[t]he policy language . . . does not

require the insured to have a current job."  *Id.*  Still, Oliver's contentions miss the

mark because, regardless of whether Oliver's "regular occupation" is the job he

abandoned six years earlier, defendants were still entitled to verify the accuracy of

the medical records Oliver submitted in support of his claims.  *See, e.g.*, doc. 34-4

at 11 (policy language stating, "We may have you examined as often as we may

19

reasonably require while a claim continues.").  Relevant here, the medical records were not as definitive in confirming Oliver's disability as Oliver contends.  For example, Oliver reported at his medical appointments that his subjective pain level had decreased by approximately half during the months after he initially claimed disability.  *See* docs. 29-5 at 11; 34-18 at 11; 34-1 at 503–05.  Moreover, records from the Doleys Clinic Pain and Rehabilitation Center showed that Oliver was able to "perform self-care activities [and] household tasks, and [care] for his wife."  Doc. 31 at 23 (citing, *e.g.*, doc. 34-1 at 426–29).

Additionally, from a clinical standpoint, Dr. Johnson's records noted "no instability," doc. 34-1 at 531, 619, 622–23, which cast his opinion that Oliver was totally disabled into doubt.  Licciardello testified that

> instability [at L4-5 and L5-S1] affects treatment options, . . . symptoms, . . . [and] prognosis.  Instability is not something that is generally resolved without surgical intervention.  It is expected to continue to be symptomatic because . . . in a degenerative spondylolisthesis, which is what [Oliver] has, . . . it's not expected to improve.  It will continue to progress, and when you add instability onto it, then improvement without surgical intervention . . . is not likely.

Doc. 29-5 at 37.  A person who then has "no instability" has a condition that will improve.  As Dr. Nichols, the physician defendants selected and whose opinion led

to the approval of Oliver's claim,[7] explained, Dr. Johnson's report "mentioned there's a spondylolisthesis, and then in the next sentence [stated] no instability noted. That makes no sense." Doc. 34-15 at 13. Dr. Nichols added that even if the "no instability" notation was a "typo," Dr. Johnson still failed to adequately emphasize the segmental instability or discuss the instability in such a manner "that others could understand what [it] means." *Id.* at 13–14. Put differently, by stating that Oliver had "no instability" and then by refusing initially to talk to DMS about Oliver, Dr. Johnson created a chain of events that caused defendants to have to further investigate the claim and to ultimately request the IME. Indeed, as Dr. Nichols testified, "it [was] reasonable for the insurance company to have referred [Oliver] for an [IME]" in light of Dr. Johnson's report. *Id.* at 15.

In short, to prove bad faith, Oliver bears the burden of demonstrating that MONY lacked a legitimate or debatable reason to investigate his claim further and to request additional information, including an IME. For the foregoing reasons, including, but not limited to, Dr. Johnson's medical records which failed to accurately portray Oliver's medical history, Oliver's own testimony about the decrease in his pain, and Oliver's refusal to submit to an IME by Dr. Freudenburger, the court finds that Oliver cannot meet his burden. Therefore,

---

[7] Unlike Dr. Johnson's medical report, Dr. Nichols found instability during his examination of Oliver, which from a medical standpoint corroborated Oliver's subjective complaints. *See* doc. 34-15 at 14–15. As a result, defendants approved Oliver's claim.

because "Alabama courts have made clear that, '[w]hen a claim is fairly debatable, the insurer is entitled to debate it, whether the debate concerns a matter of fact or law,'" *Atl. Specialty Ins. Co.*, 644 F. App'x at 926 (quoting *Bowen*, 417 So. 2d at 183) (some quotation marks omitted), MONY's motion as to Count IV is due to be granted, and Oliver's motion denied as to MONY.

### E. Negligence and Wantonness (Count V)

Oliver's claim in Count V for alleged negligence and wantonness in handling his claim, *see* doc. 1-1 at 12–14, fails because the Alabama Supreme Court "has consistently refused to recognize a cause of action for the negligent handling of insurance claims, and it will not recognize a cause of action for alleged wanton handling of insurance claims." *Kervin v. Southern Guar. Ins. Co.*, 667 So. 2d 704, 706 (Ala. 1995). *See also Pate v. Rollison Logging Equipment, Inc.*, 628 So. 2d 337, 345 (Ala. 1993) (same); *Chavers v. National Security Fire & Casualty Co.*, 405 So. 2d 1, 5 (Ala. 1981) ("[W]e have expressly rejected any cause of action based upon an insurer's negligence in handling direct claims."). Accordingly, defendants' motions are due to be granted as to Count V.

### F.  Trespass to Property (Count VI)

In Count VI, Oliver pleads a claim for trespass to property,[8] contending that defendants "acknowledged custody of a portion of insurance funds identified for payment to [Oliver] in the amount of specifically identified funds of $33,600.00," and that this amount "rightfully belonged to [him] and did not require [him] to sign any 'release' of any Defendant."  Doc. 1-1 at 14.  This contention is based on the settlement offer Brian Hayes sent to Oliver, which stated:  "I am writing to confirm the Company's settlement offer of $33,600 in exchange for a full release of your claim and surrender of Policy 87x1-26-65 for cancellation."   Doc. 34-3 at 93. Oliver fails to cite, and this court has not found, any Alabama case holding that a proposed settlement of an insurance policy constitutes conversion.  Accordingly, defendants' motions as to Count VI are due to be granted.

### IV. CONCLUSION

In light of the foregoing, Oliver's motion for partial summary judgment, doc. 27, is due to be denied.   MONY's and DMS's motions for summary judgment, docs. 30 and 32, are due to be granted.  The court will enter a final order consistent with this Memorandum Opinion.

---

[8] Defendants construe this as a claim for conversion, and Oliver agrees.  *See* doc. 38 at 25.  A claim for conversion requires Oliver to prove "[l]egal title with immediate right of possession . . . to the converted property at the time of conversion."  *See Roberson v. Ammons*, 477 So. 2d 957, 962 (Ala. 1985).

**DONE** the 21st day of December, 2016.

_____

**ABDUL K. KALLON**
UNITED STATES DISTRICT JUDGE